# EXHIBIT B

SP-630-C REV. 9/85

**STATE OF CONNECTICUT**
**DEPARTMENT OF PUBLIC SAFETY**
**DIVISION OF STATE POLICE**

Case Number F99-250944
Date 8-11-99
Time Started 0405
Time Ended 0550

H 346-4461

STATEMENT OF Akon Ortiz

I, Akon Ortiz, date of birth 1-22-81,

of 51 Santangelo Circle, town/city of Middletown

make the following statement, without fear, threat, or promise, knowing that it may be used against me in court. I have been advised of my right to remain silent, that I have a right to consult with an attorney prior to any questioning and to have the attorney present during the questioning; that, if I do talk to the police, I can terminate the questioning at any time; that if I cannot afford an attorney, one will be appointed for me by the court. I understand the above rights and, at this time, waive them. I have also been advised that any statement(s) made herein which I do not believe to be true, and which statement is intended to mislead a public servant in the performance of his/her official function, is a crime under C.G.S. section 53a-157. AO

I have not recieved any medication or pain medicine from the Hospital at this time. I am not under the influence of any narcotic or alcoholic substance at this time and have not done any drugs for the past two weeks. I give this statement of my own free will, without any threats or promises having been made to me.

AO

A On Tuesday, August 10, 1999 I went to my friends Joe Roys house at about 7:00pm. Joe lives at Declercia road in Middletown. While at Joe's house I call Kristen Quinn my ex-girlfriend at about 10:30pm and we talked for about ten minutes. AO She asked me to call her back in ten minutes AO I called Kristen back at her house and she agreed to meet me at Westby school on the playground at about 1:00 am. At about 12:30am on Wednesday, August 11, 1999 I left Joe's house and walked past Langlane, through the field and went into the nature park through the rear entrance. While walking through the nature park I hear noises in the woods and I thought the noise was A.O.

By affixing my signature to this statement, I acknowledge that I have read it and/or have had it read to me and it is true to the best of my knowledge and belief.

Witness: Det. C. R. Roya #1186    Signature: Akon Ortiz

Witness: Det. T. Welch #7201    Signature:

Personally appeared the signer of the foregoing statement and made oath before me to the truth of the matters contained therein.

If notarized, endorse here:

Page 1 of        Pages

STATE OF CONNECTICUT

Case Number F99-250944

**STATE OF CONNECTICUT**
**DEPARTMENT OF PUBLIC SAFETY**
**DIVISION OF STATE POLICE**

STATEMENT OF ___Akou Ortiz___ (Cont.)

Skunks in the woods. The noise could be heard and then it would stop. I turn around and start back words listening for the noise. I turn around and walk over the bridge. When I got to the other side heading towards the school I heard noise and I turned around to see two guys running at me. I thought I saw a gun on the guy to the left and I just opened up on both with my gun. I was carrying a Lorren [Ruger] 380 with a seven round clip and one in the chamber. Both guys dropped to the ground. I saw Cars with strobe lights and I tossed my gun away and started to lay down and I caught one in the back of the leg. The guys never yelled anything, no stop, no police, no freeze. I saw no flashlights or badges. Off. officer, [Det.] Yepez jumped on me and was yelling and striking me with his hand and gun. I do not want to talk to the Police about the gun I had on me. I believe that when the two guys were running at me I saw a third guy with something flashlight, or badge.

AO

affixing my signature to this statement, I acknowledge that I have read it and/or have had it read to me and it is true to the best of my
wledge and belief.

ess: Det. E. P. Dowg  1186    Signature: _____

ess: Det. Welty  #307

onally appeared the signer of the foregoing statement and made oath before me to the truth of the matters contained therein.

tarized, endorse here: _____

# EXHIBIT C

# APPELLATE COURT

## OF THE

## STATE OF CONNECTICUT

JUDICIAL DISTRICT OF MIDDLESEX

A.C. 22770

**STATE OF CONNECTICUT**

**v.**

**AKOV ORTIZ**

BRIEF OF THE DEFENDANT- APPELLANT
WITH ATTACHED APPENDIX

MOIRA L. BUCKLEY
DEPUTY ASSISTANT PUBLIC DEFENDER
JURIS NUMBER 414519
OFFICE OF THE CHIEF PUBLIC DEFENDER
2911 DIXWELL AVE. – 4TH FLOOR
HAMDEN, CONNECTICUT  06518
TEL.  (203) 867-6150
FAX: (203) 867-6157

COUNSEL OF RECORD
AND
ARGUING ATTORNEY

## NATURE OF PROCEEDINGS/STATEMENT OF FACTS

Following a jury trial in the Superior Court for the Judicial District of Middlesex, before Clifford, J., the defendant was convicted of one count of assault in the first degree pursuant to Connecticut General Statute § 53a-59(a)(1), two counts of assault in the first degree pursuant to §§53a-59(a)(5)[1], one count of assault on a peace officer pursuant to § 53a-167c and one count of carrying a pistol without a permit pursuant to §29-35(a).[2]

On December 7, 2001 he was sentenced to 18 years incarceration on both assault in the first degree counts to run consecutive to one another and concurrent to a term of ten years for assault on a peace officer and concurrent to a term of five years for carrying a pistol without a permit. The defendant's total effective sentence is 36 years incarceration. His appeal was filed on February 9, 2002.

Joseph Roy, a friend of the defendant's, testified that on August 8, 1999 around 6:00 pm, the defendant was at Roy's house on Cubetta Road in Middletown. Tr. 10/3/01 at 98. The defendant stayed there until close to 12:45 am. Id. at 99. Roy observed the defendant call his girlfriend, Kim Quinn during the evening. Id. at 100. Quinn lived near the Wesley School. Id. The defendant made plans to meet up with Quinn at the school. Id. at 100-102. Roy heard the defendant tell Quinn that he missed her and wanted to see her. Id. at 102. When the defendant left Roy's house around 12:45 am, it was to walk to the school to meet Quinn. Id. at 102.

Roy also testified that the defendant had a silver, black handled .38 caliber handgun on him that evening as well as on previous nights. Id. at 102. Roy observed the defendant load the handgun earlier that night. Id. at 103.

[1] The court merged the count of assault on a peace officer under 53a-59(a)(5) as it applied to Officer Warner, with count three, assault in the first degree pursuant to 53a-59(a)(1) as it applied to Officer Warner.

[2] Statutory and constitutional provisions may be found in the Appendix at A20-24.

David Gervais, a lieutenant at the Middletown Police Department, had been working the evening shift as the Supervisor of the Detective Bureau on August 10, 1999. Tr. 10/3/01 at 128. He received information that the defendant would be meeting someone behind Wesley School. Id. at 129. The police had a warrant for the defendant and based on this information planned to take the defendant into custody at the school. Id.

The plan was carried out with three officers from the detective unit and five officers from the street crime unit. Id. at 130. Upon learning the defendant's plan, Detectives Augeri and Yepes were dispatched to the Wesley School at 10:45 p.m. to learn the "lay of the land." Id. When the detectives returned to the police station they presented a written summary to nine or ten officers, describing the field and area behind the school. Id. The summary identified three avenues of entry onto the field. Id. at 131. The officers' plan was to have individuals in place covering each avenue of entry in order to apprehend the defendant. Id.

Based on the summary, officers were split into two teams. Id. One would cover the areas behind the school near the playground and one would cover the area on the other side of the field behind the school but near the footbridge that was a mode of entry onto and egress from the field. Id. The officers assigned to the footbridge area were Sergeant Melford, Detective Yepes, Detective Augeri and Detective Warner. Id. at 131-32. Detective Batts was assigned to the roof of the school, Detective Gervais, Detective Strick, Detective Duffy and Officer Harris were assigned to the area near the playground, across the field from the footbridge. Id.

The officers arrived at the school around midnight. Id. at 131. They parked their cars at a nearby restaurant and walked onto school grounds. Id. at 132. The state presented testimony of all officers assigned to carry out the plan. The following is a summary of that testimony from varying perspectives.

Detective Augeri testified that he was stationed at one end of the bridge. Tr. 10/4/01 at 32-34. His job was to hide in the reeds on one side of the bridge, at the end of it so that

if the defendant crossed over the bridge to get onto the field Augeri could unexpectedly jump on the defendant, taking him into custody. Tr. 10/4/01 at 34-37. Detective Warner was given the same assignment but was placed on the other side of the bridge. According to Augeri, it was a dark night, however, it was moonlit and light emanated from the school onto the field and the bridge area. Id. at 38. His testimony regarding light was repeatedly contradicted by the testimony of other officers on the field that night.

Before the defendant arrived on the scene, Augeri, Warner and others had time to practice their 'take down' moves. Id. at 34-38. That is, Augeri and Warner would hide in the reeds until they could not be seen. Id. Another officer would then pretend to be the defendant and cross the bridge. Id. When the officer would step off the bridge onto the field, Augeri and Warner would jump out of the reeds, grab his arms on both sides and take him down to the ground. Id. Augeri and Warner made certain that they were so well hidden that they were invisible to anyone crossing the bridge. Id.

Augeri claimed that the natural moonlight and the light coming from the school reflected on to the bridge and made it difficult for them to conceal themselves so they had to make an effort to hide. Id. On cross examination, Augeri stated that he was unaware that pursuant to the Naval Observatory there was a new moon on the night in question, meaning there was no moon out that night. Id. at 66-67.

Augeri was aware of the defendant's presence when he heard footsteps approaching the bridge. Tr. 10/4/01 at 39-40. The defendant stopped before crossing the bridge and then proceeded across at a slow pace. Id. When the defendant stepped off the bridge, Augeri attempted to grasp the defendant's shoulder and yelled 'police, get down!' Id. at 40-41. The defendant spun to his left and yelled, "oh, shit!" Id. at 41. Augeri claimed to have seen something silver in the defendant's hand. He saw a muzzle flash and was hit by a bullet. Id.

Augeri heard more shots and saw more muzzle flashes and then heard Detective Warner screaming that he had been hit. Id. at 41. While Augeri was stationed on the left

3

side of the bridge, Warner had been stationed on the right side of the bridge. Warner's description of the lighting starkly contrasts Augeri's. According to Warner, there was no lighting on the field as it was "fairly dark out." Tr. 10/9/01 at 151. Warner heard footsteps on the path leading to the bridge. Id. at 156. Half way across the bridge, the footsteps paused and then continued. Id. at 156-157.

According to Warner, once the defendant crossed the bridge, Warner and Augeri approached him from behind and were two – three feet away from him when they yelled "police, get down on the ground" Id. at 159-60. Warner placed his left arm on the defendant's right shoulder and tried to grab the defendant's right hand. Id. at 161. The defendant spun out of Warner's grasp. Id. at 161-62. Warner heard the defendant say "oh, shit" after they yelled "police, get down!" Id. at 162.

After the defendant spun away, Warner heard gunfire and realized that he had been shot. Id. The defendant fired his weapon immediately after Warner put his hands on the defendant. Tr. 10/10/01 at 49. Warner was able to draw his weapon and fired it at the defendant. Tr. 10/9/01 at 164-68. Warner had been shot in both arms and the leg. Id. at 164. He dropped his weapon after firing at the defendant. Id. at 168. Warner acknowledged that in his police statement he did not include that the defendant exclaimed "oh, shit!" Tr. 10/10/01 at 50-51.

Sergeant Mefferd was stationed in the woods just before the bridge. Tr. 10/4/01 at 198-204. His purpose was to prevent the defendant's escape if, after the defendant started to cross the footbridge heading toward the field, he turned around and attempted to run back over the bridge into the woods and up the nature trail back to the street. Id. Mefferd would be there to stop the defendant if he ran back over the bridge. Id. Mefferd watched the defendant proceed down the nature trail to the bridge. Mefferd followed in the woods behind the defendant and observed something shiny and metal in the defendant's hand. Id. at 204-207. Mefferd heard Augeri and Warner yell "police, get down" almost simultaneous to the shots that were fired. Id. at 208.

4

Detective Yepes had the same assignment as Mefferd. Tr. 10/5/01 at 6. Yepes observed the defendant walking down the path toward the bridge. Id. at 15. The defendant stopped before he crossed the bridge because a twig had broken. Id. The defendant looked around and slowly crossed the bridge. Id. Yepes heard Augeri and Warner yell "police" two times and "get down" two times. Id. With this, Yepes started running across the bridge and then heard five to seven shots. Id. at 16-17. When Yepes eventually approached the defendant, who also suffered a gunshot wound, the defendant exclaimed that Yepes set him up and that the defendant was scared and that is why he shot Augeri and Warner. Id. at 20, 25.

The defendant informed the paramedic who transported him to the hospital that he did not know who it was that "came out of the woods and shot him." Id. at 52. The defendant also told the paramedic that he "showed" the police and that they "can't just jump out of the woods and jump someone." Id.

Lieutenant Gervais had been stationed across the field from the bridge. He heard people across the field yelling "police, down, police, down", almost simultaneous with the gunshots that he heard. According to Gervais, none of the officers were in uniform. Tr. 10/3/01 at 132. Gervais testified that the goal of the plan was to approach the defendant from behind and "achieve the element of surprise." Tr. 10/4/01 at 8. Unlike Augeri, Gervais observed no moon out that night. It was "quite dark", there was fog on the field and the visibility conditions were so poor that as he sat on the playground he lost sight of things that were 100 feet away. Id. at 8. When Gervais approached the scene of the shooting, he could not identify any officers until he was within four to five feet of them. Id. at 9.

Gervais wrote his police report within hours of the incident while the events were fresh in his mind and so that he could maintain an accurate record of what had occurred. Id. at 13-15. Despite this objective, he did not include in his report that he heard someone yell "police get down." Id.

Detective Duffy had been stationed on the playground area. She described visibility as foggy and dark with no lighting on the playground or in the field behind the school. Tr. 10/4/01 at 98-104. She heard gunshots, then yelling "police get down" and then she heard more gunshots. Id. at 106. Because there was no moon out and it was dark, she could not see what was happening across the field. Id. at 117. When Duffy approached the bridge area she tended to Detective Warner. Id. at 107. She also noticed a silver, semiautomatic handgun approximately five to seven feet away from where the defendant was being taken into custody. Id. at 109. The weapon was "stove-piped" or jammed. Id.

Officer Strick was stationed on the playground near Duffy. Id. at 132. There was a haze in the air according to Strick and it was "very, very poor as far as visibility, there isn't any light out there." Id. Strick heard someone yell "police, get down" but then admitted that she really heard a "bunch of yelling." Id. at 145. She started running towards the bridge and heard gunshots. Id. at 133-34. Not much time elapsed between the yelling, Strick running, and the gunshots. Id. at 146. Strick ran across the field and eventually found Augeri who had been shot. Id. at 135. Strick could not see who was there once she got to the other side of the field, she could only see silhouettes. Id.

Patrolman Harris sat in the woods near the playground. Id. at 160-61. He heard someone yell "police", heard gunshots and saw lights on the other side of the field. Id. at 164. Harris admitted on cross examination that "police" the light flash and the gunshot were instantaneous and that there really was no time interval between the one shout of "police" and the gunshot. Id. at 184. From the roof, Detective Batts heard "police, get down", seconds passed and he heard gunshots. Id. at 189.

The defendant gave a statement to Detective Daigle while he received treatment for his gunshot wound at Hartford Hospital. Tr. 10/5/01 at 81-83. The defendant informed Daigle that he had been jumped and that he wanted to get his story on the statement. Id. In his statement, the defendant said that when he crossed the bridge two men came running at him. Id. He thought he saw a gun on the man to the left so the defendant shot at them.

He then saw strobe lights coming from cars, tossed his weapon and lay on the ground. Id.

Someone shot him in the leg. Id. He never heard anyone yell "stop, police, or freeze," he never saw flashlights or badges. Id.

When the two men were running at him, the defendant thought he saw a third man coming as well. Id. This is consistent with Yepes testimony that he ran over the bridge toward the skirmish. When Yepes eventually located the defendant, the defendant claimed this statement that Yepes hit him in the head with a gun as well as Yepes' hand. Id.

State's exhibit 16 is a photograph of the defendant taken at the hospital which depicts bruises on his face. The defendant asked Daigle why they needed to conduct gunshot residue tests on his hands since the police knew he shot a weapon. Id. at 90.

After the incident in question, Detective Twohill met with the defendant in the jail cell area of the courthouse to formally arrest him for the charges at bar. Tr. 10/16/01 at 33, 37-39. According to Twohill, who wrote nothing down, the defendant offered the following statement: That he was not one of those "dumb guys" on the street who does not know how to shoot. Id. at 37-38. His father taught him how to shoot "real good." Id. That is why he shot those cops in their right arms, because he knew they were right handed. Id. He stated that he was not trying to kill them. Id. There were three cops hiding in the woods, he heard moving around and it sounded like a skunk. Id. There were two cops in camouflage, three in dark clothing. Id. He could see pretty well from the parking lot lights and the street lighting. Id.

Despite Twohill's claims, there was no evidence that lighting from a parking lot or the street illuminated the woods and the bridge area. In fact all evidence points to the contrary. Twohill did not state whether the defendant was asserting that he knew there were police officers in the woods as he walked through them and over the bridge on the night in question, or if the defendant was simply stating to Twohill what he had learned these things after the scenario played out.

Dr. David Courtney treated the defendant at Hartford Hospital after the incident. Tr. 10/5/01 at 110-112. The defendant suffered abrasions on his face as well as a gunshot wound to the back of his thigh with no exit wound. Id. The bullet remained in the defendant when he was discharged on August 12, 1999. Id.

The parties stipulated that the defendant did not have a permit for his weapon. Tr. 10/11/01 at 183. They also stipulated that Detective Warner suffered serious physical injury. Tr. 10/10/01 at 8.

## ARGUMENT

I.    **THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY DELIVERING AN UNNECESSARY INSTRUCTION ON THE DUTY TO RETREAT EXCEPTION TO THE JUSTIFICATION DEFENSE.**

The state neither presented evidence nor argued that the defendant had a duty to retreat before he used deadly physical force in this case. The trial court's instruction on the defendant's duty to retreat misled the jury and was crucial to the outcome of this case since the jury was not ultimately faced with a credibility contest between two inconsistent versions of the altercation. Instead, the principal factual issues in this case were dependent upon the subtleties of the law of self-defense. The erroneous instruction deprived the defendant of his fundamental due process right guaranteed by the Fourteenth Amendment to the United States Constitution and Article First, §8 of the Connecticut Constitution, to have the trial court deliver proper jury instructions on the elements of self-defense so that the jury could ascertain whether the state met its burden of proving beyond a reasonable doubt that the assault was not justified. See State v. Whitford, 260 Conn. 610, 617-619 (2002).

A.    **Relevant Facts/Reviewability**

The trial court instructed the jury on the "duty to retreat" exception to the justification defense:

# EXHIBIT D

| MIDDLETOWN POLICE DEPARTMENT | | | SUPPLEMENTARY REPORT |
|---|---|---|---|
| (1-A) Incident | | (2-A) Date Assigned | (3-A) Case Number |
| -Police Investigation-Warrant Service | | 08/10/99 | 99-24097 |

| A) Originally Classified as | (5-A) Victim | (6-A) Address |
|---|---|---|
| | | |

(7-A) Narrative:

On the above date this writer was working the evening shift as the Supervisor of Investigative Services. For the past several days, all the Units of the Investigative Services have been attempting to locate an Akov Ortiz in order to serve a Domestic Violence arrest warrant on him.

At approximately 2215hrs., members of the Patrol Division stopped a vehicle in the Main Street area that the suspect was alleged to have been seen in. The Officers stopped the vehicle and found on the operator, Carl Mignosa, as being the only person in the vehicle. The operator became very upset with the officers who stopped him. As a result of his actions at the scene, the operator was eventually arrested and brought to HQ.

At approximately the same time, Detective Duffy received a phone call from a Kristen Quinn. Kristen Quinn is the victim and complainant for active domestic violence warrant. Kristen advised Detective Duffy that she had just received a phone call from Akov Ortiz. He was looking to see her on this date. Kristen told Akov that she couldn't talk now because her sister was on the other line of the total phone. Kristen told Akov to call back in ten minutes. Kristen advised Detective Duffy that because her sister was on the other line, the caller ID did not show up. Approximately ten minutes later Kristen called back to state that Akov called her again. The number on the caller ID was 346-6588 and that the address was on Daddario Rd and it was listed to an Angel Diaz. She advised Detective Duffy that Angel Diaz lives on Daddario Rd. Members of the investigative Division then checked phone books, information and city directories and found the only Angel Diaz to reside ı Cubeta Road. Kristen stated that Akov stated that he was going to come to her house to visit him. She stated that wasn't a good idea because her neighbor was watching for his timer lights to go on and that he would call the police. Kristen then told Akov that she would meet him at the play scape at Wesley School. After several discussions, they set the time for 100am.

Members of the Crime Suppression Unit and the Investigative Services then decided to set up a plan to serve the Domestic Felony Warrant on Akov Ortiz when he entered the field behind Wesley School. The following Officers from the Crime Suppression Unit and the Investigative Services were assigned to the plan: Sgt. Mefferd, Officers Warner,Augeri, Yepes and Batts from the Crime Suppression Unit and Lt. Gervais,Detectives Shewbridge and Duffy of the Investigative Services and Officer Harris from Patrol.

The following plan was devised in an attempt to apprehend Akov Ortiz. Sgt. Mefferd along with Officers Yepes,Warner and Augeri were assigned to the northend of the field behind Wesley School. There was a small bridge that entered the field from a nature trail that started from Randolph Road. Kristen stated that this was the probable path that Akov would enter the area by. Officer Batts was assigned to sit ontop of Wesley School with night vision in order to view the entire field area. This writer along with Detectives Shewbridge and Duffy and Officer Harris took up a

{Page 1. / Investigative Unit Report}

| (8-A) Case Status: Unfounded ☐ | Bona Fide Case - Cleared ☐ | Not Cleared ☐ | (9-A) Investigating Detective: Lt. David Gervais #3178 Signature: _LT_____ 3/78 |
|---|---|---|---|

(10-A) The space below is reserved for the Commanding Officer approving this report.

| ...e Status To Be | Follow Up | Follow Up By | |
|---|---|---|---|
| Check One  Filed ☐ | By Detective ☐ | Uniform Patrol ☐ | (11-A) _____ Signature of Supervisor |

MIDDLETOWN POLICE DEPARTMENT                                           SUPPLEMENTARY REPORT
(1-A) Incident                                          | (2-A) Date Assigned | (3-A) Case Number
-Police Investigation-Warrant Service                   | 08/10/99            | 99-24097

| .A) Originally Classified as | (5-A) Victim | (6-A) Address |
|---|---|---|

(7-A) Narrative:

position behind a fence near the playscape.  The plan was to get Akov into the field and then take him into custody.

      This writer looked at his watch at 0050hrs to see what time it was.  A very short time later I was looking across the field towards the bridge area when I heard gun fire erupt.  I then heard approximately 10 shots and saw the flashes of same.  I immediately began to make my way to the area of the gunshots.  While doing so, I turned my portable radio on and heard someone yelling into the radio 10-0, shots fired.  While running across the field I could hear someone yelling I've been hit. Upon arrival at the scene, both injured officers were being tended too by the other officers assigned to the scene.  The accused had been taken into custody and was being covered by Officer Yepes. Numerous Patrol Units then arrived on the scene and secured same.  The accuse and the injured officers were transported to hospitals from treatment of their injuries.

      State Police Major Crime was summonsed for and took over the investigation.   No further action taken at this time.

{Page 2. / Investigative Unit Report}

(8-A) Case           ☐                    ☐                     ☐      | (9-A) Investigating Detective: Lt. David Gervais #3178
Status: Unfounded      Bona Fide Case - Cleared      Not Cleared       | Signature: L. T. _____ 3178

(10-A) The space below is reserved for the Commanding Officer approving this report.

. Status: To Be          Follow Up          Follow Up By

                         ☐                 ☐                  ☐
Check One: Filed      By Detective      Uniform Patrol           (11-A) _____
                                                                        Signature of Supervisor

# EXHIBIT E

DOCKET NO. CR9-151223          :   SUPERIOR COURT
            CR9-151946

STATE OF CONNECTICUT           :   JUDICIAL DISTRICT OF MIDDLESEX

VS.                            :   AT MIDDLETOWN, CONNECTICUT

AKOV ORTIZ                     :   OCTOBER 5, 2001




B E F O R E:

            HONORABLE PATRICK J. CLIFFORD, JUDGE




A p p e a r a n c e s:

    For the State:

            Timothy Liston, Esq.
            State's Attorney's Office
            One Court Street
            Middletown, CT 06457


    For the Defendant:

            Norman Pattis, Esq.
            51 Elm Street
            Suite 409
            New Haven, CT 06510

            James Nugent, Esq.
            236 Boston Post Road
            Orange, CT 06477




                        Pamela Gendreau
                        Court Recording Monitor
                        One Court Street
                        Middletown, CT  06457

```
1                    J O R G E   Y E P E S,

2   222 Main Street, Middletown, Connecticut, having been first duly

3   sworn, testified upon his oath as follows:

4            THE COURT:  I'm sorry.  Go ahead.

5   DIRECT EXAMINATION BY MR. LISTON:

6      Q   So you've been with the Middletown Police Department eight

7   years?

8      A   That's correct.

9      Q   And what unit are you assigned to?

10     A   I'm assigned to the street crime unit.

11     Q   How long have you been in that unit?

12     A   I've been there approximately three years.

13     Q   And what do your duties include as a member of that unit?

14     A   I basically work narcotics.  We do a lot of crime

15  suppression in the area, areas where there's a lot of crime.  I

16  usually work in that area.

17     Q   I want to direct your attention to August 10, August 11,

18  '99.  Were you in the street crime unit at that time?

19     A   Yes, I was.

20     Q   What shift were you working then?

21     A   I was working the 4 to 12 shift.

22     Q   Which would be what?

23     A   4 p.m. to 12:00 midnight.

24     Q   I want to further direct your attention on the evening of

25  August 10, '99, did you receive information regarding Akov Ortiz?

26     A   Yes, we did.

27     Q   And what information had you received?
```

1    A    We received that Mr. Ortiz was going to be going up to

2    Wesley School where he was supposed to be meeting his girlfriend.

3    Q    And was there a time indicated?

4    A    I believe the time, he was supposed to be there around

5    12:30.

6    Q    After receiving that information, did you do anything?

7    A    Yes.   Myself and Detective Augeri -- and I'm not sure if

8    there was another detective with us.   I believe it would have

9    been Detective Warner, but I'm not positive.   Went down to the

10   area where Mr. Ortiz was supposed to be in order see what the

11   area looked like so that we can devise a plan so we can arrest

12   him.

13   Q    Were you familiar with the Wesley School area?

14   A    At that time --

15   Q    Before that evening?

16   A    Before that, no.   I wasn't.

17   Q    About what time did you go out there?

18   A    I'm not positive on a time.   It might have been like

19   10:30, 11:00.   I'm not sure.

20   Q    When you got out there, what area did you check out?

21   A    We checked out the field behind the school.   We checked

22   out the wooded area, which you have to cross a small little

23   bridge to get to.   Our information was that Mr. Ortiz was going

24   to be coming from the wooded area, crossing the bridge, onto the

25   field, and then going up to the playground where he was supposed

26   to meet his girlfriend.

27   Q    So how far into the wooded area did you check?

1    A    We walked -- from the bridge, we walked a couple of

2    different paths.  That we checked a couple different paths out.

3    How far into the woods, I don't recall how far we went.

4    Q    How much time did you spend in the bridge area?

5    A    We were there probably for about, I'm not sure, maybe

6    forty five minutes or so.

7    Q    When you were out there, what were the weather conditions?

8    A    It was hot, muggy.  That was about it.

9    Q    What were the lighting conditions, starting with the area

10   around the school?

11   A    The area around the school itself had some light on it.

12   The field itself, which is a little further away from the school

13   itself, was extremely dark.  The wooded area was dark.

14   Q    And when you were out there the initial time, did you have

15   to cross the bridge to get to the wooded area?

16   A    Yes, we did.

17   Q    And did you or any of the other detectives fall down or

18   stumble over anything when you were out there that first time?

19   A    Not that I can recall.

20   Q    When you got into the wooded area, what was the visibility

21   in the wooded area?

22   A    It was dark depending on how far you are from wherever you

23   can see.  I mean, I could see Detective Augeri walking in front

24   of me or standing five feet away from me, I could see him.  But

25   if he was further down the woods, I probably wouldn't have been

26   able to see him.

27   Q    Could you describe the walking path area that you saw?

1  How wide were the paths, what were the trails like?

2      A    They were just trails that open up into different areas in

3  the woods that people walk.  They're just walking trails.

4      Q    What was the consistency of the trails?

5      A    It was, I would say they were just dirt.  You know, not

6  really -- it's hard to describe.  They're just walking paths.  It

7  wasn't like there was trees in the way or big rocks or anything

8  like that.  It was just walking paths.

9      Q    How wide were the paths?

10     A    Wide enough so you could have at least two people walking

11  on them, two or three maybe.

12     Q    After checking out the area you described, did you go back

13  to the police station?

14     A    Yes, we did.

15     Q    And did you report your observations to other officers?

16     A    Yes, we did.

17     Q    And thereafter, were there discussions about what you were

18  going to be doing?

19     A    Yes, there was.

20     Q    And who was involved in the discussion?

21     A    I believe Detective Augeri, Detective Warner, Detective

22  Batts, Detective Strick, Detective Duffy, Lieutenant Gervais,

23  Sergeant Mefferd, Officer Solis, Officer Harris maybe.  I'm not

24  sure who else was there.

25     Q    And as a result of the discussions, was a plan formulated?

26     A    Yes, there was.

27     Q    And what was your responsibility to be?

1    A    My responsibility was to cover the area, the wooded area.

2    To observe as Mr. Ortiz was going to walk through and walk over

3    to the other side where the field was.

4    Q    Officer Solis, who's he?

5    A    Officer Solis at the time was the canine officer.

6    Q    And do you know what his assignment, if any, was?

7    A    His assignment was, he was standing by just down the

8    street a little bit from where, from the school with his dog in

9    case Mr. Ortiz decided he was going to run into the wooded area

10    or something.  So we could have a canine available.

11    Q    Was Solis and his dog to be on the school property?

12    A    I'm sorry?

13    Q    Were Solis and his dog to be on the school property?

14    A    They were going to be eventually.  Yes.  At the time, they

15    weren't on the school property.

16    Q    About what time did you go out to the Wesley School area

17    to set up?

18    A    I think it was 11:30, quarter of.  I'm not positive.

19    Q    And where did you go to?

20    A    I went to my assigned area.

21    Q    Initially, how did you get out there?

22    A    We drove up there.  We parked the cars over at a

23    restaurant on -- South Main Street, was it.  I can't remember the

24    name of the restaurant.  It might have been the Cyprus

25    Restaurant.  And we parked there and walked over to the school.

26    Q    When you got to the school area or -- yeah, when you got

27    to the area of the building of the Wesley School, what were the

1   lighting conditions at that time in the vicinity of the school?

2       A    The vicinity of the school wasn't bad.  They had some

3   lights.  The parking lot there, you could see people walking

4   around or whatever or if anybody came through.  That wasn't -- I

5   mean, that area was a little bit lit up because it's a school.

6   They usually have lights on there anyway.

7       Q    And did officers stay in the area of the school?

8       A    Yes.  There was going to be officers in the area of the

9   school.

10      Q    And who stayed in the area of the school?

11      A    There was Detective Batts, Detective Strick, Detective

12  Duffy, Lieutenant Gervais, Officer Harris.  I believe that was

13  it.

14      Q    And where did you go from the school?

15      A    I went over to the wooded area.

16      Q    And who went with you, if anyone?

17      A    Myself and Sergeant Mefferd, went with me.

18      Q    About how far was it from the school building to the

19  bridge?

20      A    I would be only guessing.  I don't know.

21      Q    All right.  Don't guess.  As you progressed across the

22  field, what were the lighting conditions?

23      A    It was dark.

24      Q    When you got to the area of the bridge, what were the

25  lighting conditions?

26      A    It was dark.

27      Q    You and Mefferd, any other officers going over there with

1  you?

2     A   Detective Warner and Detective Augeri walked down the

3  field with us, but they didn't cross the bridge over to the

4  wooded area.  They stayed on the other side of the bridge.

5     Q   How were you dressed at that time?

6     A   I believe that night I was wearing my uniform.

7     Q   Could you describe that for us?

8     A   We have our police uniform, which is a dark blue uniform.

9     Q   Is that something you usually wear as a member of the

10  street crime unit?

11     A   At that time, that's what I was wearing.  Yes.  I was part

12  of the street crime, crime suppression unit, which is a uniformed

13  patrol officer in an unmarked police car.

14     Q   And could you describe the uniform that you were wearing

15  that evening, the color, what you had on?

16     A   It was a dark blue uniform.  It's the standard police

17  issued uniform that we all wear.  Dark blue, badge hanging on my

18  left side, nameplate.  That was it.

19     Q   What sort of equipment did you have on your belt?

20     A   I had my gun, my PR-24, my cap stun, my handcuffs, and my

21  radio.  That's it.

22     Q   What's a PR-24?

23     A   PR-24 is our nightstick.

24     Q   What's cap stun?

25     A   A cap stun is our spray that we use for, pepper spray

26  basically is what it is.

27     Q   Did you and Mefferd cross the bridge?